The TRUSTEES OF INDIANA UNIVERSITY, Appellant (Plaintiff Below),

v.

COUNTY DEPARTMENT OF PUBLIC WELFARE OF KOSCIUSKO COUNTY, Appellee (Defendant Below).

No. 3–281A56.

Court of Appeals of Indiana, Third District.

Sept. 28, 1981.

Rehearing Denied Nov. 13, 1981.

H. Kim TeKolste, Hall, Render & Killian, Indianapolis, for appellant.

Duane G. Huffer, Warsaw, for appellee.

HOFFMAN, Presiding Judge.

Anna B. Bradley was admitted to the Indiana University Hospital on February 11, 1979, March 31, 1979 and May 6, 1979 suffering from a disease, defect or deformity. On April 20, 1979, she applied for Hospital Commitment Assistance with the County Department of Public Welfare of Kosciusko County pursuant to IC 1971, 12–5–1–1 (Burns 1981 Repl.).[1] The Welfare Department determined that she did not qualify for Hospital Commitment Assistance for the reason of "financial ineligibility." Anna Bradley was a member of a three person household with a total income from Social Security and Black Lung benefits of $771.98 per month. Upon her admission to the hospital, she reported the family's debts to be in excess of $3,430, however, $1,100 of that total were debts of her husband's for which she was not responsible. In addition, she incurred expenses of $8,410.98 for hospital care and services. $2,000 of this bill has been paid by the Indiana Vocational Rehabilitation Program, leaving a balance of $6,410.98 due and owing.

Bradley was joined by the Indiana University Trustees, a party effected by the determination, in a trial de novo. The trial court found that Anna Bradley was financially able to defray the necessary expenses of her hospital care and rendered a judgment against her and the Trustees. From

this judgment, the Indiana University Trustees appeal.

The facts were stipulated by the parties and the single issue raised on appeal is whether as a matter of law the trial court erred in determining that Bradley was financially able to defray the necessary expense of her medical, surgical and hospital care.

The Trustees argue that the Welfare Department should not have used the standards for the Aid to Dependent Children Program in making Bradley's eligibility determination. They also argue that the Welfare Department did not take into consideration the size of the hospital bill and the length of time it would take Bradley to pay off her debts.

■ The term "financially unable to defray" is very broad and has not been defined in Indiana by statute or case law. In construing a statute the words should be accorded their plain and ordinary meaning. *Murphy v. State* (1980), Ind.App., 414 N.E.2d 322. The American Heritage Dictionary of the English Language, 1976, defines "defray" as: "[t]o meet or satisfy by payment; pay."

■ The county welfare departments were given the power to make these determinations without being given any specific criteria to use. The Welfare Department involved in this cause chose to apply the standards used in the Aid to Dependent Children Program in making its eligibility determinations for hospital assistance. In using the formula chosen the Welfare Department determined that Bradley's monthly income exceeded the "subsistence" level by $225 per month, and thus Bradley was financially ineligible.

The Trustees argue that because of the size of the hospital bill it would have taken Bradley many months to pay it off. Applying the entire amount over "subsistence" strictly to the hospital bill, it would take approximately 29 months to pay it off.

1. Effective January 1, 1982, IC 12–5–1–1 is repealed. P.L. 144, Senate Enrolled Act No.

243 (1981) created IC 12–5–6–1 *et seq.* to replace IC 12–5–1–1.

The Trustees feel this is unreasonable. They contend that the Welfare Department should pay the bill and then obtain reimbursement from Bradley pursuant to IC 1971, 12–5–1–16, which provides that the county welfare departments may be reimbursed by executing a repayment contract with someone who is able to repay part or all of his medical care costs over a period of time. This provision can be interpreted to cover a situation where a change of circumstances in the future enables the patient to repay the welfare department. It is only reasonable to conclude that if a patient is able to execute a repayment contract at the time of the eligibility determination, then the patient should pay that money to the hospital instead.

The Hospital Commitment Assistance Program can be differentiated from other medical assistance programs. In programs such as Medicaid, Medicare and the Crippled Children's Program, Bradley would qualify for assistance only if she agreed to pay the excess resources, over the "subsistence" level, to the Welfare Department under a repayment or "spend-down" agreement. Granted, Bradley would not qualify for these programs for reasons other than financial. However, with the amount of excess resources of Bradley, to be financially eligible for any of the other welfare programs, she would have first had to agree to repayment or "spend-down" conditions. Under the Hospital Commitment Assistance Program, there is no such requirement for eligibility, only a provision that the welfare departments *may* be reimbursed *when* and *if* a contract can be entered into with the party. The local welfare department, which has a finite amount of resources, cannot force a party with funds to repay it, but a hospital can.

With these circumstances, the Legislature gave the local welfare departments the power to make the eligibility determinations. The evidence contained in the stipulated facts is sufficient to support its decision and the decision is reasonable. The decision was affirmed when reviewed by the trial court. Absent some showing of abuse, arbitrariness or capriciousness in the decision, as a matter of law the trial court should be affirmed. No such showing has been made and therefore, the trial court is affirmed.

Affirmed.

GARRARD, J., concurs.

STATON, J., dissents with opinion.

STATON, Judge, dissenting.

The majority has allowed the Welfare Department to determine if one is able to defray the necessary expenses of one's medical care by using standards from the Aid to Dependent Children Program when that very program considers those standards not to be suited for such a task. The majority has also circumvented the legislature by adding a restriction to the existing statutes. I respectfully dissent.

The majority concludes that Bradley was financially able to defray the necessary expenses of her medical, surgical, and hospital care because, according to Aid to Dependent Children Standards, her Black Lung benefits and Social Security benefits total more than a "subsistence" level. I can not agree with the majority because computing if Bradley surpasses a "subsistence" level of income does not determine if she is financially able to defray the necessary expenses of her expensive medical, surgical, and hospital care.

The Aid to Dependent Children Program recognizes that its basic eligibility requirements, which the Welfare Department used to determine that Bradley's Black Lung and Social Security benefits exceeded a "subsistence" level, do not allow sufficient resources to cover the expenses of medical care, because they are not rationally related to a determination of ability to pay medical expenses; therefore, the Aid to Dependent Children Program has a separate standard to be applied when determining if a family qualifies for medical assistance due to an inability to pay for medical care. I would not allow a standard to be used to determine if one qualifies for medical assistance when the creator of that standard does not

believe it to be rationally related to the determination of ability to pay for medical care.

If the Welfare Department had used the Aid to Dependent Children Program's Medical Assistance Standard, IC 12–1–7–18.6, the Bradley family would qualify for medical assistance. I believe that this standard attempts to take into account the following considerations that the "subsistence" standard used by the Welfare Department did not: (1) While a family may be able to meet the usual expenses associated with a "subsistence" level of existence, this does not mean the family can afford to pay for unusual medical, surgical, and hospital care; (2) It is to the State's advantage to have curable diseases, defects, or deformities cured in their early stages because (a) they are less expensive to cure in their early stages (b) the sooner the citizen is cured, the sooner he may be able to become an employed (productive) *tax paying* citizen.

Someone barely over a "subsistence" level of income is more likely to delay treatment until the time the State must pay the now more expensive medical cure; (3) Since family resources have to provide for the entire family, a reasonable amount of the resources above the usual family "subsistence" level should be reserved pro rata to meet other family needs including the illness of other members of the family. Neither standard considers the total amount of the medical, surgical, and hospital expenses of the other members of the family or the amount of time it will take a family to pay these expenses. Common sense dictates that the total amount of expenses and the time required to pay them should be considered when one determines if someone is able to pay for their medical, surgical, and hospital care.

The majority states that IC 1971, 12–5–1–16 "can be interpreted to cover a situation where a change of circumstances in the future enables the patient to repay the Welfare Department." The majority then circumvents the legislature by legislating a new restriction. This restriction states that IC 12–5–1–16 only applies when there are future changes of the patient's financial circumstances. The legislature stated that repayment contracts could be executed *whenever* the Welfare Departments determined the patient could repay over a period of time all or part of the medical costs. These words must be construed in light of the factual and legal circumstances existing at the time of their enactment, not now. *Rose v. State* (1976), 168 Ind.App. 674, 345 N.E.2d 257, 260.

The majority, ever mindful that County Welfare Department budgets are presently decreasing, adds its restriction to the meaning of the statute so that patients, such as Bradley, who could repay at least part of her medical costs if given time, will not qualify. I do not believe the legislature intended such a narrow interpretation for IC 12–5–1–16 when it was passed in the early 1950's. P.L. 144, Senate Enrolled Act No. 243 (1981) was created in response to our present circumstances. I can not agree to legislate a new restriction on IC 12–5–1–16 just before it is repealed on January 1, 1982 by proper legislative action. I believe people such as Bradley come within its terms and IC 12–5–1–1.

I would instruct the trial court to vacate its judgment and to enter judgment for the Trustees of Indiana University.