FILED

May 17 2023, 8:39 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEYS FOR APPELLANT MEGA
OIL, INC.

Charles E. Traylor
Jeffrey B. Kolb
Kolb Roellgen & Traylor LLP
Vincennes, Indiana

ATTORNEY FOR APPELLANT STOLL
KEENON OGDEN, PLLC

Robert L. Burkart
Ziemer Stayman Weitzel & Shoulders,
LLP
Evansville, Indiana

ATTORNEY FOR APPELLANTS JANICE M.
PEGRAM, DONNELLE K. PEGRAM, STACY
A. PEGRAM, PAUL W. PEGRAM, STEVEN J.
PEGRAM, AND TRAVIS J. PEGRAM

Keith Edward Rounder
Evansville, Indiana

ATTORNEYS FOR APPELLANT
CHATTANOOGA OIL & GAS, LLC

David L. Jones
Paul Wallace
Craig Emig
Jones Wallace, LLC
Evansville, Indiana

ATTORNEY FOR APPELLANT BRENDA L.
FANCHER, TRUSTEE OF THE LAIR TRUST

Thomas Graham Dycus
Hart Bell, LLC
Vincennes, Indiana

ATTORNEYS FOR APPELLEE

James D. Johnson
Chad J. Sullivan
Jackson Kelly PLLC
Evansville, Indiana

William C. Illingworth
Illingworth Law Group LLC
Evansville, Indiana

MEGA OIL, INC., an Illinois Corporation, et al.,

*Appellants-Defendants*,

v.

CITATION 2004 INVESTMENT, LLC, a Delaware Limited Liability Company,

*Appellee-Plaintiff.*

May 17, 2023

Court of Appeals Case No. 22A-MI-1275

Appeal from the Gibson Circuit Court

The Honorable Gary J. Schutte, II, Special Judge

Trial Court Cause No. 26C01-1901-MI-56

**Opinion by Judge Brown**
Judges Bailey and Weissmann concur.

**Brown, Judge.**

[1] Mega Oil, Inc. ("Mega Oil"), Stoll Keenon Ogden, PLLC, Janice Pegram ("Pegram"), Donnelle K. Pegram, Stacy A. Pegram, Paul W. Pegram, Steven J. Pegram, Travis J. Pegram, Chattanooga Oil & Gas, LLC, and Brenda L. Fancher as Trustee of the Lair Trust ("Lair Trust") (collectively, the "Appellants") appeal and raise multiple issues which we consolidate and restate as whether the trial court erred in granting summary judgment. We affirm.

*Facts and Procedural History*

[2] On August 30, 1937, pursuant to an oil and gas lease (the "Keck Lease"), J.H. McClurkin obtained oil and gas rights with respect to approximately 480 acres of real property in Gibson County, Indiana, and the lease was recorded on November 24, 1937. The Keck Lease stated that it was between J.H. McClurkin "hereinafter called lessee" and

> Jno [sic] Keck, widower, Louis D. Keck and Roblye P. Keck, his wife, Robt. A. Keck, and Louise Hopkins Keck, his wife; Emily Keck-Schrode and Wm. E. Shrode, her husband, and Louis D. Keck, Robt. A. Keck and Franck L. Keck, Trustees for Hellen Keck Yow, Mt. Vernon of Ind. Hereinafter called lessor (whether one or more).

Appellants' Appendix Volume V at 112. The property subject to the Keck Lease had the following legal description: "S½ Sec. 27-T3S-R14W, E½ NE½ Sec. 27-T3S-R14W, SW½ NE¼ Sec. 27-T3S-R14W, and W½ SW¼ 26-T3S-R14W." *Id.* According to the Keck Lease, it would "remain in force for a term of ten years from this date, and as long thereafter as oil or gas or either of them is produced from said land by lessee." *Id.*

[3] It contains the following provisions:

> 3rd. To pay lessor for gas produced from any oil well and used off the premises or in the manufacture of gasoline or any other product a royalty of one-eighth (1/8) of the market value, at the mouth of the well, payable monthly at the prevailing market rate.
>
> If no well be commenced on said land on or before the 30th day of August, 1938, this lease shall terminate as to both parties,

unless the lessee shall on or before that day pay or tender to the lessor or to the lessor's credit in the Peoples Bank & Trust Co. Bank at Mt. Vernon Ind, or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of One hundred twenty Dollars, which shall operate as a rental and cover the privilege of deferring the commencement of a well for twelve months from said date. The payment herein referred to may be made in currency, draft, or check, at the option of the lessee; and the depositing of such currency, draft, or check, in any post office, with sufficient postage and properly addressed to the lessor, or said bank, on or before said last mentioned date, shall be deemed payment as herein provided. In like manner and upon like payments or tenders, the commencement of a well may be further deferred for like periods of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privilege granted to the date when said first rental is payable as aforesaid, but also the lessee's option of extending that period as aforesaid, and any and all other rights conferred.

* * * * *

If said lessor owns a less interest in the above described land than the entire and undivided fee simple estate therein, then the royalties and rentals herein provided for shall be paid the said lessor only in the proportion which lessor's interest bears to the whole and undivided fee.

If the estate of either party hereto is assigned—and the privilege of assigning in whole or in part is expressly allowed—the coven[a]nts hereof shall extend to their heirs, executors, administrators, successors or assigns, but no change in the ownership of the land or assignments of rental or royalties shall be binding on the lessee until after the lessee has been furnished with a written transfer or assignment or a true copy thereof: and it is hereby agreed that in the event this lease shall be assigned as to a part or as to parts of the above described lands and the

assignee or assignees of such part or parts shall fail or make default in the payments of the proportionate part of the rentals due from him or them, such default shall not operate to defeat or affect this lease in so far as it covers a part or parts of said lands upon which the said lessee or any assignee thereof shall make due payment of said rental, and this lease shall never be forfeited for non-payment of any rental due until after at least ten days' written notice by registered mail or in person shall have been given the lessee.

*Id.* at 112-113.

[4] On August 18, 2009, Pegram, Paul Pegram, Steven Pegram, and Travis Pegram, collectively as the single lessor, entered into an Oil and Gas Lease (the "Pegram Lease") with Lair Trust, the lessee, with respect to approximately 143 acres of property in which Pegram claimed to own an interest. The Pegram Lease, recorded on November 30, 2009, includes a legal description of approximately 62.7 acres of the property, and this description is a verbatim description of the property subject to the Keck Lease as described in the Pegram Affidavit. On August 19, 2009, Janice Pegram ("Pegram") filed an Affidavit for the Cancellation of Oil and Gas Lease ("Pegram Affidavit") in Gibson County, which sought to cancel the Keck Lease and stated that "Janice M. Pegram, is the owner of an interest in the following described real estate and entitled to rentals and royalties payable under the following described oil and gas leases," "[n]o rentals or royalties have been paid to said Owner or received by any person, bank, or corporation on behalf of said Owner, for a period of more than one (1) year after they have become due," the "leases has not been operated for the production of oil or gas for more than one (1) year, both by

nonproduction of oil or gas and by nondevelopment of said lease," and "[p]ursuant to Indiana Code 32-5-8-1, said Owner does hereby request the Recorder to certify upon the face of said Oil and Gas Leases that they are Invalid and Void and Canceled of Record." Appellants' Appendix Volume II at 80-81.

[5] On August 24, 2009, the Gibson County Recorder stamped the Keck Lease "INVALID-VOID (Per. IC. 32-5-8-1)." Appellants' Appendix Volume V at 114. On November, 24, 2009, the Indiana Department of Natural Resources ("DNR") approved well permit number 54020 ("Pegram Well #1) for the drilling of a new well, located on the land of the Keck Lease, to be operated by Ice and Potts Oil Co. on behalf of Mega Oil.

[6] On April 1, 2010, Noble Energy, Inc. ("Noble") assigned Citation its "right, title, and interest" in the Keck Lease. *Id.* at 151. On May 25, 2010, a purchase agreement executed between Noble and Citation required Citation to pay $554,000,000 for assets it would acquire located in Indiana, Illinois, and Oklahoma. The purchase agreement stated in part that Citation would acquire "the oil and gas leases . . . owned by Seller in the counties set forth in Exhibit A-6, including those listed on Exhibit A-1 (collectively, the 'Acquired Leases') and the lands covered thereby . . ., and the production of Hydrocarbons in, on, or under the Leased Lands." *Id.* at 174.

[7] On July 6, 2010, the Lair Trust assigned its interest in the Pegram Lease to Mega Oil. On July 28, 2017, Citation became aware of Pegram Well #1 when it was listed on the DNR database.

[8] On January 17, 2019, Citation and Citation Oil and Gas Corp. ("Citation Oil") (together, "Citation Companies") jointly filed a five-count complaint seeking, in part, under Count I a declaratory judgment finding that the Keck Lease is valid, Citation is the holder of the Keck Lease, the Pegram Lease is void and invalid, the Pegram Affidavit is facially erroneous, Mega Oil's activities constitute a trespass, and ejecting Mega Oil from the property and enjoining them from operating within the lands of the Keck Lease. It alleged slander of title and willful trespass under the other counts. On November 7, 2019, Mega Oil filed a motion for partial summary judgment claiming to be a bona fide purchaser for value. On February 19, 2020, Citation Companies filed an amended complaint adding as additional defendants Paul W. Pegram, Steven J. Pegram, Donnelle K. Pegram, Travis J. Pegram, Stacy A. Pegram, Brenda L. Fancher as trustee of Lair Trust, John Runyon, David Elliott, Denise Elliott, Chattanooga Oil & Gas, LLC, Lone Oak Energy, LLC, and Bethlehem Oil, LLC. On June 26, 2020, the trial court held a hearing on Mega Oil's motion for partial summary judgment, which it denied on July 23, 2020. In its July 23, 2020 order, the court concluded that "[t]he sole issue raised in Defendant's Motion for Summary Judgment is whether Mega Oil was a bona fide purchaser," and it concluded that Mega Oil was not a bona fide purchaser. Appellants' Appendix Volume III at 158.

On May 25, 2021, Citation Companies filed a motion for partial summary judgment as to Count I. On September 13, 2021, the court entered an Agreed Order of Dismissal as to Citation Oil.

On April 7, 2022, the court held a hearing on Citation's motion for partial summary judgment. On May 5, 2022, the court issued an Order on Summary Judgment, which granted Citation's motion and stated in part that, "since the granting of the Keck Lease, over twenty (20) oil and gas wells have been drilled and completed on the Leased Premises," "Keck well Numbered 76X-26 (Permit Number 45319) under the Keck Lease continues to produce oil in paying quantities to this day," the Pegram Affidavit falsely stated the Keck Lease had not produced oil or gas for more than one year, "[t]here is no contradictory evidence regarding the continuing production of the Keck Lease," and that, absent a valid partial termination, a lease continues to all lands and depths. The court concluded summary judgment was proper because:

> a) The Pegrams did not possess the legal authority to lease oil and gas that were already under lease based on a review of the records in the chain of title and the continuing production on the Lease.
>
> b) The Pegram Affidavit and the Pegram lease were void on their face under Indiana law existing before and after those documents were executed. *Wilson v. Elliot*, 589 N.E.2d 259 (Ind. Ct. App. 1992)[.]
>
> c) Mega Oil had actual and constructive notice of the valid Keck Lease before it took the assignment of the Pegram Lease.

Appellants' Appendix Volume II at 33-34, 37.

*Discussion*

This Court reviews an order for summary judgment *de novo*, applying the same standard as the trial court. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). The moving party bears the initial burden of making a *prima facie* showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Manley v. Sherer*, 992 N.E.2d 670, 673 (Ind. 2013). Summary judgment is improper if the moving party fails to carry its burden, but if it succeeds, then the nonmoving party must come forward with evidence establishing the existence of a genuine issue of material fact. *Id.* This Court construes all factual inferences in favor of the nonmoving party and resolves all doubts as to the existence of a material issue against the moving party. *Id.* The review of summary judgment is limited to the materials designated to the trial court. *Siwinski v. Town of Ogden Dunes*, 949 N.E.2d 825, 827 (Ind. 2011).

I.

The first issue is whether the Keck Lease was validly canceled by the Pegram Affidavit pursuant to Ind. Code § 32-23-8-1. Appellants argue that "the Recorder voided and canceled the Keck Lease pursuant to the Lease Cancellation Statute." Appellants' Consolidated Brief at 17 (citing *Wilson v. Elliott*, 589 N.E.2d 259, 262 (Ind. Ct. App. 1992)).

Citation counters that "the Pegram Affidavit and the cancellation of the Keck Lease were void ab initio." Appellee's Brief at 17. It cites *Wilson v. Elliott*, for the proposition that "[t]he land covered by a lease is deemed a unit and it is the

nonproduction and nondevelopment of the unit as a whole that supports cancellation of the lease." *Id.* at 18 (citing *Wilson*, 589 N.E.2d 259, 262 n.3 (Ind. Ct. App. 1992)). According to Citation, "the argument that [a leaseholder] failed to produce oil or gas from a small portion of the total leased property—is insufficient to establish that the habendum clause has been breached and to support a partial cancellation of the Lease." *Id.* (citing *Meisler v. Gull Oil, Inc.*, 848 N.E.2d 1112, 1116 (Ind. Ct. App. 2006)).[1] Citation asserts "the Affidavit of Cancellation was void because it '[sought] to partially terminate the Keck Lease as to only certain lands of the lease.'" Appellee's Brief at 18-19 (quoting Appellants' Appendix Volume II at 36). It claims Appellants have "not designated evidence of both nonproduction on and nondevelopment of *all* the lands within the Keck Lease." *Id.* at 17.

---

[1] In *Meisler*, the Court observed:

> In general, a habendum clause is the portion of a deed defining "the extent of the ownership in the thing granted to be held and enjoyed by the grantee." BLACK'S LAW DICTIONARY 710 (6th ed. 1990). More specifically, in the context of oil and gas law, the purpose, operation, and construction of the habendum clause in oil and gas leases has been described as follows:
>
>> "The modern habendum clause, with its short primary term and its 'thereafter' provision, is designed to measure the duration of the oil and gas lease by its primary objective, the production of oil or gas. The clause seeks to assure the lessor that the leased premises will be put in production, from which the lessor will be paid a royalty, within the primary term or the lease will terminate, either at the end of the primary term, or if there is then production, thereafter upon the cessation of production. The lessee is assured of a fixed time in which to obtain production and of keeping the lease as long as production continues."
>
> Gull Oil's Br. p. 6 (quoting 3 Williams, Howard R. and Meyers, Charles J., *Oil and Gas Law* § 604 (1985)).

848 N.E.2d at 1114-1115.

[14]    Ind. Code § 32-23-8-1 is titled "Void leases" and provides:

> Leases for oil and gas that are recorded in Indiana are void:
>
> > (1) after a period of one (1) year has elapsed since:
> >
> > > (A) the last payment of rentals on the oil and gas lease as stipulated in the lease or contract; or
> > >
> > > (B) operation for oil or gas has ceased, both by the nonproduction of oil or gas and the nondevelopment of the lease; and
> >
> > (2) upon the written request of the owner of the land, accompanied by the affidavit of the owner stating that:
> >
> > > (A) no rentals have been paid to or received by the owner or any person, bank, or corporation in the owner's behalf for a period of one (1) year after they have become due; and
> > >
> > > (B) the leases and contracts have not been operated for the production of oil or gas for one (1) year.

[15]    Ind. Code § 32-23-8-3 is titled "Voiding of cancellation" and provides:

> If, at any time after the cancellation of a lease and contract and within the term provided in the lease or contract, the lessee submits to the recorder:
>
> > (1) a receipt or a canceled check, or an affidavit, showing that the rental has been paid; or
> >
> > (2) an affidavit that:
> >
> > > (A) the lease has been operated within a period of one (1) year before the cancellation, as stipulated in the lease or contract; and

> > (B) the affidavit of the lessor provided under this chapter is false or fraudulent;

> the cancellation is void, and the recorder shall so certify at the place where the cancellation of the lease and contract has been entered.

[16] *Wilson v. Elliot* addressed a situation in which a lessor attempted to partially cancel a lease, 60 acres of a 120-acre oil and gas lease. 589 N.E.2d 259 (Ind. Ct. App. 1992). The procedure for removing an abandoned oil and gas lease was at the time codified in Ind. Code § 32-5-8-1[2], but is now codified in substantially similar fashion at Ind. Code § 32-23-8-1, and the Court held:

> Logically, if the written request incorrectly identifies the land and the lease, the county recorder cannot certify on the appropriate title which lease is null and void. Incorrect certifications destroy the goal of clear and reliable record titles. The trial court did not err, therefore, when it concluded Wilson incorrectly identified both the land and the lease when in his affidavit he sought to have part of the 1965 lease cancelled, but at trial he sought to have part of the 1973 Wilson Lease cancelled. *See id.* Because filing an adequate affidavit is a condition precedent to having an oil and gas lease rendered void on the record title, and because

---

[2] *Wilson* states that Ind. Code § 32-5-8-1 provided in relevant part:

> [U]pon the written request of the owner of such lands, accompanied with the affidavit of such owner, stating that no rentals have been paid to or received by such owner or any person, bank or corporation in his behalf for a period of one (1) year after they have become due, and that such leases and contracts have not been operated for the production of oil or gas for one (1) year, the recorder of the county in which such real estate is situated shall certify upon the face of such record that such leases and contracts are invalid and void by reason of nonpayment of rentals and is thereby canceled of record, which request and affidavit shall be recorded in the miscellaneous records of said recorder's office.

*Wilson*, 589 N.E.2d at 262.

> Wilson did not meet this condition, Elliott and Sons's oil and gas leases are still valid.

*Wilson*, 589 N.E.2d at 262 (footnote omitted). In a footnote, the Court disagreed that the statute provided for the partial cancellation of leases and stated that according to such an interpretation:

> lessors would be free to cancel from leases any parcel of land, no matter how large or small, provided there was no production or development on the specific piece of land for a period of more than one year. The land covered by a lease is deemed a unit, and it is the nonproduction and nondevelopment of the unit as a whole that supports cancellation of the lease.

*Id.* at 262 n.3.

[17] In *Meisler*, the Court saw "no reason to depart from the *Wilson* analysis," and similarly concluded that "the Meislers' argument that Gull Oil failed to produce oil or gas from the Acreage—a small portion of the total leased property—is insufficient to establish that the habendum clause has been breached and to support a partial cancellation of the Lease." 848 N.E.2d at 1116. The Court noted that the Meislers argued "that the habendum clause and the Lease are divisible and that the clause applies separately to the distinct portions of the leased property," but concluded from the contract's language that "[t]here is simply no support in this unambiguous contractual language for the Meislers' argument that Gull Oil has breached this clause if it fails, for a time, to produce oil or gas from a *portion* of the leased property," and "[a]bsent a contrary

provision in the lease, the habendum clause is unaffected by assignments or partial assignments by the lessor or by the lessee." *Id.* at 1115.

[18] *Barr v. Sun Exploration Co.* interpreted Ind. Code § 32-23-8-1, codified at that time as Ind. Code § 32-5-8-1, and a lessor argued that nonproduction of any oil from the lessee's well for a period of fourteen months meant that the lease was null and void. 436 N.E.2d 821, 823 (Ind. Ct. App. 1982). The Court determined that "the clear language of the statute requires both the cessation of development and production for there to be a cessation of operations" and that "the legislature intended that both the nonproduction of oil and gas and the nondevelopment of the lease together be shown to prove a cessation of operations for oil and gas." *Id.* at 824-825.

[19] To the extent Mega Oil argues the Pegram Affidavit canceled the Keck Lease, the record reveals the Pegram Affidavit stated that Pegram "is the owner of an interest in the following described real estate and entitled to rentals and royalties payable under the following described oil and gas leases," and included a description of an area of 62.7 acres in which Pegram owned her interest, which is less than the total 480 acres of the Keck Lease. Appellants' Appendix Volume V at 231. The Pegram Affidavit seeks cancellation of the Keck Lease and claims that "[s]aid leases has [sic] not been operated for the production of oil or gas for more than one (1) year, both by nonproduction of oil or gas and by nondevelopment of said lease," and asks the Recorder of Gibson County "to certify upon the face of said Oil and Gas Leases that they are Invalid and Void and Canceled of Record." *Id.* at 232. We cannot say the

Pegram Affidavit properly described the lands of the Keck Lease, identified Pegram as owner of the lands of the lease, or constituted an affidavit adequate to cancel the lease. *See Wilson*, 589 N.E.2d at 262 (the affidavit of cancellation did not comply with the cancellation statute "because the affidavit he filed did not correctly describe the lease he sought to have forfeited or the land the lease covered").

[20] Even if the Pegram Affidavit adequately described the lands of the Keck Lease and Pegram as the owner, the designated evidence demonstrates continued oil production. The trial court's order found that "since the granting of the Keck Lease, over twenty (20) oil and gas wells have been drilled and completed on the Leased Premises," a single well produces in paying quantities to this day, "Keck well Numbered 76X-26 (Permit Number 45319) under the Keck Lease continues to produce oil," and "[t]here is no contradictory evidence regarding the continuing production of the Keck Lease." Appellants' Appendix Volume II at 33-34. In his affidavit, Fletcher Ortiz, a Senior Landman for Citation, makes multiple statements, including: "[o]perations have been conducted continuously on the Keck Lease through the present date"; "over twenty (20) oil and gas wells have been drilled and produced on the Keck Lease continuing up to the present day," "[a]s of the date of this affidavit, the Keck Number 76X-26 (Permit Number 45319) continues to produce oil in paying quantities from

the Keck Lease";[3] and "the affiants of the Affidavit for Cancellation of Oil and Gas Lease would not, nor were required to receive royalties under the Keck lease." Appellants' Appendix Volume IV at 6. In his deposition, Ortiz agreed that he "would have had involvement with oil and gas leases," *id.* at 215, and he stated that he "oversee[s] the assets on the land side of multiple states including Indiana," Citation has "an active producing lease called the Keck Lease," "[i]t's been producing for decades, over 20, 30 years," and "Mega Oil . . . took a lease over a portion of the [Keck] lease." *Id.* at 231. The designated evidence reveals there was continued oil production on the lands of the Keck Lease, and the Pegram Affidavit was not adequate to cancel the Keck Lease on this additional ground.[4]

[21] Citation argues the trial court erroneously relied on the first summary judgment order ("First Order"), issued on July 23, 2020, which addressed Appellants' previous motion for summary judgment when it issued its May 5, 2022 Order on Summary Judgment. Appellants state that Citation relied on the First Order as "law of the case" when it cited conclusions from the First Order in its brief; "[i]n entering both the First . . . Order and the Appealed Order, the trial court adopted verbatim Citation's proposed orders"; "the trial court did not scrutinize the proposed findings and conclusions before adopting them"; the First Order

---

[3] At oral argument, Citation's counsel noted that "the Keck Number 76X-26" is an error, and the correct well that has continued to produce oil, and to which Ortiz meant to refer, is 76X-27.

[4] We do not render an opinion regarding the extent to which Pegram is entitled to payment pursuant to the terms of the Keck Lease.

dealt with only Mega Oil's bona fide purchaser defense and is not conclusive in the current motion; and relying on the First Order kept the trial court from considering Appellants' evidence it designated in response to Citation's partial motion for summary judgment and other objections and motions. Appellants' Consolidated Brief at 29.

[22] "The 'law of the case' doctrine designates that an appellate court's determination of a legal issue is binding on both the trial court and the Court of Appeals in any subsequent appeal given the same case and substantially the same facts." *City of Gary v. Smith & Wesson Corp.*, 126 N.E.3d 813, 832 (Ind. Ct. App. 2019). "The purpose of the doctrine is to minimize unnecessary repeated litigation of legal issues once they have been resolved by an appellate court. This doctrine is based upon the sound policy that once an issue is litigated and decided, that should be the end of the matter." *Id.* "Accordingly, the law of the case doctrine bars relitigation of all issues decided directly or by implication in a prior decision." *Id.* "A court has the power to revisit prior decisions *of its own or of a coordinate court* in any circumstance, although as a rule courts should be loathe [sic] to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work manifest injustice." *Id.* "The trial court is not a coordinate court to this [C]ourt; thus, it has no power to alter an appellate decision." *Id.*

[23] The record reveals that, in its brief supporting its motion for partial summary judgment, Citation noted some of the findings of the trial court from the First Order and asserted:

> Due to these conclusions which are now the law of the cases and the undisputed material facts, Plaintiff is entitled to a judgment as a matter of law that Mega Oil is operating the Pegram #1 without legal authority and that Citation is the true holder of the oil and gas interests in the Leased Premises.

Appellants' Appendix Volume III at 182 (footnote omitted). In footnote five of its brief supporting its motion for partial summary judgment, Citation qualified its use of the phrase "law of the cases," stating:

> Plaintiff acknowledges that this Court has the power to revisit its prior decision but "as a rule courts should be loathe [sic] to do so in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would work manifest injustice." Such extraordinary circumstances clearly do not apply here.

*Id.* (citation omitted). The trial court's Order on Summary Judgment does not contain the phrase "law of the case" or otherwise state that it considered the First Order to be the law of the case. The trial court determined that Mega Oil was not a bona fide purchaser, and in its order granting Citation's motion for summary judgment, the court found "[t]he issue raised in Defendant's Motion for Summary Judgment is whether the Keck Lease is valid and the validity of the subsequent Pegram Lease." Appellants' Appendix Volume V at 36. We cannot say the trial court adopted its First Order as law of the case for its order on Citation's motion for summary judgment.

[24] To the extent Appellants assert the trial court "did not scrutinize the proposed findings and conclusions before adopting them," they cite *Kitchell v. Franklin*, 26

N.E.3d 1050 (Ind. Ct. App. 2015). Appellants' Consolidated Brief at 29. In *Kitchell*, this Court noted:

> The trial court made these findings by accepting verbatim Whitsell-Sherman's proposed findings of fact. This practice weakens our confidence as an appellate court that the findings are the result of considered judgment by the trial court. *Prowell v. State*, 741 N.E.2d 704, 708-09 (Ind. 2001). *Here, the adoption of the proposed findings was not by an entry that recited the findings. Rather, it was by a one-line order reciting in relevant part, "Findings of fact and conclusions of law approved as per order."* This practice leaves us with an even lower level of confidence that all findings reflect the independent evaluation by the trial court.
>
> [*Cook v. Whitsell-Sherman*, 796 N.E.2d 271, 273 n.1 (Ind. 2003).] As seen from the above-quoted text, *Cook* does not stand for the proposition that findings of fact and conclusions of law adopted verbatim are inherently suspect; instead, the case calls attention to the fact that the trial court in that case merely "approved as per order" the party's submitted findings and conclusions. *See id.*

26 N.E.3d at 1057. The Court continued, stating:

> It is not uncommon for a trial court to enter findings that are verbatim reproductions of submissions by the prevailing party. The trial courts of this state are faced with an enormous volume of cases and few have the law clerks and other resources that would be available in a more perfect world to help craft more elegant trial court findings and legal reasoning. We recognize that the need to keep the docket moving is properly a high priority of our trial bench. For this reason, we do not prohibit the practice of adopting a party's proposed findings. But when this occurs, there is an inevitable erosion of the confidence of an

> appellate court that the findings reflect the considered judgment of the trial court.

*Id.* at 1057-1058 (citing *Prowell*, 741 N.E.2d at 708-709). The Court stated further that "we by no means encourage the wholesale adoption of a party's proposed findings and conclusions, [but] the critical inquiry is whether such findings, as adopted by the court, are clearly erroneous," and the Court declined "to find that the trial court's findings of fact and conclusions of law in this case are inherently suspect because they are verbatim reproductions" of a party's submission. *Id.* at 1058 (citing *In re Marriage of Nickels*, 834 N.E.2d 1091, 1096 (Ind. Ct. App. 2005)).

[25] The record reveals that Citation's brief in support of its motion for summary judgment stated that "Facts 1-19, 23-24, and 26 are all findings of fact adopted by this Court in its [First Order]." Appellants' Appendix Volume III at 177. It appears the trial court adopted Citation's proposed order verbatim. *See* Appellants' Appendix Volume VI at 115-121. The court's Order on Summary Judgment differs from the First Order's findings of fact numbers 15, 26-27, its conclusions of law numbers 7-11, and in the inclusion of a section titled, "Judgment." Appellants' Appendix Volume II at 38. We cannot say the findings are clearly erroneous, the court erroneously relied on the First Order, or that it did not scrutinize the proposed findings and conclusions before adopting them.

For the foregoing reasons, we affirm the trial court.

Affirmed.

Bailey, J., and Weissmann, J., concur.